SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

SEP 0 3 2020

VICKI BEATY, COURT CLERK

BY_____DEPUTY

## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

|  |  |
|---|---|
| THE CHEROKEE NATION, | Case No. _CJ-20-414_ |
| Plaintiff, | JURY TRIAL DEMANDED |
| -against- |  |
| JUUL LABS, INC. previously d/b/a as PAX LABS, INC. and PLOOM INC.; MOTHER MURPHY'S LABS, INC.; ALTERNATIVE INGREDIENTS, INC.; TOBACCO TECHNOLOGY, INC.; ELIQUITECH, INC.; MCLANE COMPANY, INC.; EBY-BROWN COMPANY, LLC; CORE-MARK HOLDING COMPANY, INC.; CIRCLE K STORES INC.; WALMART; WALGREEN BOOTS ALLIANCE, INC.; GPM INVESTMENTS, INC.; CASEY'S GENERAL STORES, INC.; MURPHY USA, INC.; QUIKTRIP CORPORATION; KUM & GO, INC.; PETE'S OF ERIE, INC.; and PILOT TRAVEL CENTERS LLC D/B/A PILOT FLYING J, |  |
| Defendants. |  |

### PETITION

Plaintiff THE CHEROKEE NATION through Attorney General Sara Hill, bring this civil action under the common laws of the State of Oklahoma, for injunctive relief, compensatory damages, disgorgement, restitution, punitive damages, and any other relief allowed by law against the following Defendants: JUUL LABS, INC. previously d/b/a as PAX LABS, INC. and PLOOM INC.; MOTHER MURPHY'S LABS, INC.; ALTERNATIVE INGREDIENTS, INC.; TOBACCO TECHNOLOGY, INC.; ELIQUITECH, INC.; MCLANE COMPANY, INC.; EBY-BROWN COMPANY, LLC; CORE-MARK HOLDING COMPANY, INC.; CIRCLE K STORES INC.; WALMART; WALGREEN BOOTS ALLIANCE, INC.; GPM

### EXHIBIT 2

INVESTMENTS, INC.; CASEY'S GENERAL STORES, INC.; MURPHY USA, INC.; QUIKTRIP CORPORATION; KUM & GO, INC.; PETE'S OF ERIE, INC.; and PILOT TRAVEL CENTERS LLC D/B/A PILOT FLYING J (collectively referred to as "Defendants"). In support of its Petition, the Cherokee Nation alleges as follows:

1.       Defendants worked together to implement their shared goal of growing a new market of e-cigarettes in the image of the combustible cigarette market through a multipronged strategy to (a) create a highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market; (b) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit; (c) actively attract young users through targeted marketing; and (d) target vulnerable populations such as Native Americans, as recently noted by a House Subcommittee investigating the vaping epidemic, whom they used as "guinea pigs" for the testing and introduction of their products and marketing methods.[1]  As detailed more fully throughout this Petition, each of the Defendants played a critical role – at times overlapping and varying over time – in each of the strategies.

2.       Defendants have knowingly, willfully, and negligently advertised and sold nicotine products within the reservation of the Cherokee Nation and to citizens of the Cherokee Nation, including children, adolescents, and other consumers younger than the legally mandated minimum age to purchase tobacco ("underage consumers") as well as young adults[2] who were most susceptible to addiction.  In addition, Defendants knowingly, willfully, and negligently

---

[1] Memorandum from Subcommittee Staff to Democratic Members of the Subcommittee on Electronic & Consumer Policy 8 (Feb. 5, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-02-04.RK%20Memo%20re%20JUUL.pdf (last visited Aug. 28, 2020) [hereinafter "Subcomm. on Econ. & Consumer Pol'y Mem."].

[2] This Petition uses the term "young adults" to refer to individuals between the ages of 18 and 25.

advertised their nicotine products to and within the Cherokee Nation and to Cherokee Nation citizens as a smoking cessation device despite its potent nicotine strength and addictive properties. Defendants' misconduct has created a public health crisis and caused an epidemic of nicotine use and addiction by underage consumers and young adults that has foreseeably injured, and continues to injure, the Cherokee Nation.

3.      Although complete sales data are unavailable, reports have estimated that JUUL Labs, Inc. ("JLI") generated approximately $245 million in retail store sales revenue in 2017.[3] That figure grew to $1.8 billion in 2018,[4] and $1.27 billion in the first half of 2019 alone.[5] By the end of 2019, JLI still controlled approximately 70% of the e-cigarette market in the United States.[6] That market share, however, came from products designed to deliver powerful quantities of nicotine to users – many of whom became addicted as a result.

4.      To sell their products, Defendants intentionally targeted Native American communities. A Congressional report has shown, for instance, that JLI "target[ed] Native Americans as guinea pigs for its product" by peddling its products to tribal governments and incorrectly presenting them as smoking-cessation devices.[7] JLI also sold the tribes vaping

---

[3] Dan Primack, *Scoop: The Number Behind Juul's Investor Appeal*, Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html (last visited Aug. 28, 2020).

[4] *Nielsen: Tobacco All Channel BiWeekly Data thru 11/7, Cig Category Vol Declines Cont. to Mystify Us*, Wells Fargo Sec. (Nov. 27, 2018), https://athra.org.au/wp-content/uploads/2018/12/Wells-Fargo-Nielsen-Tobacco-All-Channel-BiWeekly-Report-Period-Ending-11.17.18.pdf (last visited Aug. 28, 2020).

[5] Jennifer Maloney, *Juul Halts Online Sales of Some Flavored E-Cigarettes*, Wall St. J. (Oct. 17, 2019 1:48 PM), https://www.wsj.com/articles/juul-halts-online-sales-of-some-flavored-e-cigarettes-11571331640 (last visited Aug. 28, 2020).

[6] Tribune Media, *Juul CEO is Out, and it Stops All Advertising as Vaping Crisis Escalates*, WQAD8 (Sept. 25, 2019 5:10 PM), https://www.wqad.com/article/news/local/drone/8-in-the-air/juul-ceo-is-out-and-it-stops-all-advertising-as-vaping-crisis-escalates/526-0d199ec6-5216-4330-a6aa-5ea814ee68df (last visited Aug. 28, 2020); Hattie Garlic, *Smoke and Mirrors: Juul's E-Cigarettes Were Supposed to Help Save Our Lungs. But A Dark Cloud Now Hangs Over the Company*, Tortoise Media (Oct. 28, 2019), https://members.tortoisemedia.com/2019/10/28/juul-191028/content.html?sig=F2-hETsEqGM7WUDHzC8AXJSFyVIX8x7ROaby05bkdrU (last visited Aug. 28, 2020).

[7] Subcomm. on Econ. & Consumer Pol'y Mem. at 8.

"starter kits" and encouraged tribal governments to provide the kits, without cost, to their citizens – all the while, repeating the baseless claim that its products were a safe alternative to smoking.[8]

5.       JLI's conduct has created a public health emergency in Native American communities, including in the Cherokee Nation and among its citizens, caused by nicotine addiction among underage consumers and young adults.  The number of young nicotine users has skyrocketed.  Nicotine is associated not only with dependence, but also with a wide array of serious, long-term health consequences, including increased risks of cardiovascular, respiratory, and gastrointestinal disorders; negative impacts on reproductive health and the immune system; and increased risks of cancer.  In addition, harmful chemicals in the aerosol produced by JLI's e-cigarettes have been linked to serious lung disease.  E-cigarette users, moreover, are apparently more susceptible to COVID-19, thus exacerbating the public health crisis facing the Cherokee Nation from the coronavirus pandemic.

6.       The Cherokee Nation is now acting to remedy the harms resulting from Defendants' misconduct, using public resources for addiction treatment and to address the other negative health consequences of underage and young adult e-cigarette use.  Furthermore, because young e-cigarette users are more likely to use combustible cigarettes, the Cherokee Nation will bear the increased costs of treating the devastating consequences of nicotine addiction even among those who no longer use e-cigarettes.  Nicotine addiction can last a lifetime, and the health consequences associated with prolonged nicotine use can manifest themselves over years.  Defendants' misconduct will have devastating ramifications for generations of Cherokee Nation citizens.  The Cherokee Nation seeks to hold Defendants accountable for the costs that the

---

[8] *Id.*

Cherokee Nation has incurred and will continue to incur in combating and remediating the public health crisis Defendants created.

## PARTIES

### I.   PLAINTIFF

7.     The Cherokee Nation is a federally recognized sovereign American Indian nation.  It has approximately 380,000 citizens and is the largest tribe in the United States.  It is governed by the Cherokee Nation Constitution and the laws of the Cherokee Nation and exercises inherent governmental authority within the Cherokee Nation.  Most of the members of the Cherokee Nation live in a reservation spanning a fourteen-county area in northeastern Oklahoma ("Cherokee Reservation").  The Nation's headquarters is in Tahlequah, Oklahoma.

8.     Cherokee Nation Attorney General Sara Hill brings this action pursuant to Article VII, Section 13 of the Cherokee Nation Constitution; Title 51, Chapter 4, §§101 *et seq.* of the Cherokee Nation Code; and in the exercise of her other statutory and common law powers on behalf of the Cherokee Nation in its proprietary capacity and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Cherokee Nation citizens.  In particular, Attorney General Hill brings this action to stop the growing underage smoking epidemic within the Cherokee Nation and to recover damages and seek other redress for harm caused by Defendants' improper marketing, promotion, and distribution practices relating to their tobacco products.  Defendants' actions have caused and continue to cause a crisis that threatens the health, safety, and welfare of the citizens of the Cherokee Nation.

### II.   DEFENDANTS

9.     Defendant JUUL Labs, Inc. ("JLI") is a corporation organized under the laws of Delaware with its principal place of business at 560 20th Street, San Francisco, California 94107.  PAX Labs, Inc. ("PAX") is a corporation organized under the laws of

5

Delaware with its principal place of business at 660 Alabama Street, 2nd Floor, San Francisco, California 94110. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc. and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc., was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

10.     JLI designs, manufactures, sells, markets, advertises, promotes, and distributes JUUL e-cigarettes devices, JUUL Pods and accessories (collectively "JUUL" or "JUUL products"). Prior to the formation of the two separate entities PAX and JLI in or around April 2017, JLI designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

11.     JLI was a corporate subsidiary of PAX until 2017. JLI became an independent company in 2017. JLI filed its first SEC statement and first offered securities in 2017.

12.     Since 2015, JLI has marketed, advertised, and sold its products throughout Oklahoma, including in the Cherokee Nation.

13.     JLI and its related entities are referred to jointly in the causes of action below as the "JLI Defendants."

14.     Defendant Mother Murphy's Labs Inc. ("Mother Murphy's") is a North Carolina corporation, with a principal place of business in Greensboro, North Carolina. Mother Murphy's is in the business of manufacturing and supplying the liquids and ingredients and additives in e-liquids[9] including the e-liquid in JUUL products.

---

[9] "E-liquids" are components in e-cigarettes that contain nicotine.

15.     Defendant Alternative Ingredients Inc. ("Alternative") is a wholly-owned subsidiary of Mother Murphy's.  Alternative is a North Carolina corporation, having a principal place of business in Greensboro, North Carolina.  Alternative is in the business of manufacturing and supplying the liquids, flavoring additives, and raw ingredients in e-liquids, including the e-liquid in JUUL products.

16.     Defendant Tobacco Technology Inc. ("TTI") is a Maryland corporation, with its principal place of business in Eldersberg, Maryland.   TTI is in the business of manufacturing and supplying the liquids, flavoring additives, and raw ingredients in e-liquids, including the e-liquid in JUUL products.

17.     Defendant Eliquitech, Inc. ("Eliquitech") is a wholly-owned subsidiary of TTI.  Eliquitech is a Maryland corporation, with a principal place of business in Eldersberg, Maryland.  Eliquitech is in the business of manufacturing and supplying the liquids, flavoring additives, and raw ingredients in e-liquids, including the e-liquid in JUUL products.

18.     Mother Murphy's, Alternative, TTI, and Eliquitech are referred to jointly as the "E-liquid Manufacturing Defendants."

19.     Defendant McLane Company Inc. ("McLane") is a Texas corporation with a principal place of business in Temple, Texas.   McLane is a wholly-owned subsidiary of Berkshire Hathaway.  McClane distributed JUUL products in or near the Cherokee Nation during the relevant period.

20.     Defendant Eby-Brown Company, LLC ("Eby-Brown") is a Delaware limited liability company with a principal place of business in Naperville, Illinois.  In 2019, Eby-Brown was acquired by Performance Food Group.  Eby-Brown distributed JUUL products in or near the Cherokee Nation during the relevant period.

7

21.    Defendant Core-Mark Holding Company Inc. ("Core-Mark") is a Delaware corporation. From 2015 to 2018, Core-Mark's principal place of business was in San Francisco, California. As of 2019, Core-Mark's principal place of business is in Westlake, Texas. Core-Mark distributed JUUL products in or near the Cherokee Nation during the relevant period.

22.    McLane, Eby-Brown and Core-Mark are referred to jointly as the "Distributor Defendants." Each of the Distributor Defendants distributed JUUL products in or near the Cherokee Nation during the relevant period.

23.    Defendant Circle K Stores Inc. ("Circle K") is a Texas corporation with a principal place of business in Tempe, Arizona. Circle K is a wholly owned subsidiary of Alimentation Couche-Tard Inc. based in Canada. Circle K has dozens of stores throughout Oklahoma. Circle K sold JUUL products in or near the Cherokee Nation during the relevant period.

24.    Defendant Walmart ("Walmart") is a Delaware corporation with a principal place of business in Bentonville, Arkansas. Walmart has hundreds of stores in Oklahoma, including in or near the Cherokee Nation. Walmart sold JUUL products in or near the Cherokee Nation during the relevant period.

25.    Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a Delaware corporation with a principal place of business in Deerfield, Illinois. Walgreens Boots Alliance, Inc. is a holding company that owns Walgreens, Duane Reade, and other national and international pharmaceutical manufacturing, wholesale, and distribution companies. Walgreens purchased 1,932 Rite Aid locations in 2017. Walgreens has hundreds of stores in Oklahoma,

including in or near the Cherokee Nation.  Walgreens sold JUUL products in or near the Cherokee Nation during the relevant period.

26.   GPM Investments LLC ("E-Z Mart") is a Delaware limited liability company based in Richmond, Virginia.  It operates 1,400 convenience stores in twenty-two states, including Oklahoma.  Among other chains, it operates E-Z Mart convenience stores, including many stores in or near the Cherokee Nation.  E-Z Mart sold JUUL products in or near the Cherokee Nation during the relevant period.

27.   Casey's General Stores, Inc. ("Casey's") is an Iowa corporation that owns and operates a chain of gas stations in midwestern and southern United States.  The company is headquartered in Ankeny, Iowa and has 2,146 stores in sixteen states, including many stores in or near the Cherokee Nation.  Casey's sold JUUL products in or near the Cherokee Nation during the relevant period.

28.   Murphy USA ("Murphy's") is a Delaware corporation headquartered in El Dorado, Arkansas.  It operates thousands of gas stations and stores including many in or near the Cherokee Nation.  Murphy's sold JUUL products in or near the Cherokee Nation during the relevant period.

29.   Defendant QuikTrip Corporation ("QuikTrip") is a Delaware privately held corporation headquartered in Tulsa, Oklahoma.  QuikTrip has $11 billion in revenue with more than 800 stores in eleven states, including Oklahoma and several stores in or near the Cherokee Nation.  QuikTrip sold JUUL products in or near the Cherokee Nation during the relevant period.

30.   Defendant Kum & Go, Inc. ("Kum & Go") is an Iowa limited liability company that owns and operates a chain of convenience stores located in midwestern United

States.  The company, based in Des Moines, Iowa, operates 400 stores in eleven states including Oklahoma and several stores in or near the Cherokee Nation.  Kum & Go sold JUUL products in or near the Cherokee Nation during the relevant period.

31.     Defendant Pete's of Erie, Inc. ("Pete's") is a privately-owned Kansas corporation headquartered in Parsons, Kansas.  It operates 43 convenience stores in Kansas, Oklahoma, and Missouri including locations in or near the Cherokee Nation.  Pete's sold JUUL products in or near the Cherokee Nation during the relevant period.

32.     Defendant Pilot Travel Centers LLC d/b/a Pilot Flying J ("Flying J") is a Delaware limited liability company and the largest operator of travel centers in North America. It is headquartered in Knoxville, Tennessee.  Flying J sold JUUL products in or near the Cherokee Nation during the relevant period.

33.     Circle K, Walmart, Walgreens, E-Z Mart, Casey's, Murphy's, QuikTrip, Kum & Go, Pete's, and Flying J are referred to jointly as the "Retailer Defendants."  Each of the Retailer Defendants sold JUUL products in or near the Cherokee Nation during the relevant period.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over JLI because JLI conducts business in and throughout Oklahoma, including in the Cherokee Nation, and it has deliberately engaged in significant acts and omissions that have injured the Cherokee Nation and its citizens.  The Cherokee Nation's claims arise out of those activities.

35.     In addition, this Court has personal jurisdiction over the other Defendants, each of which has substantial contacts and business dealings throughout Oklahoma, including in the Cherokee Nation by virtue of their marketing, sales, and distribution of e-cigarettes and e-

cigarette pods within Oklahoma and within the Cherokee Nation's territorial and political jurisdiction or based on their assistance or participation in such activities or in a scheme to conduct such activities.

36.     Venue is proper under 12 Okla. St. Ann. § 134 because Defendant QuikTrip is a domestic corporation and the cause of action occurred in Sequoyah County, Oklahoma.  The remaining defendants are nonresidents and may be sued in any county where the domestic-corporation defendants may be sued.  *See* 12 Okla. Stat. Ann. § 137.

### FACTS COMMON TO ALL CLAIMS

### III.     JLI CREATES A HIGHLY ADDICTIVE PRODUCT TO APPEAL TO THE YOUTH MARKET

37.     Before JLI introduced its product in 2015, most e-cigarette brands used a purified form of nicotine called freebase nicotine that, when inhaled, can lead to a "harsh" or "bitter" experience and causes some users to cough or develop a sore throat.[10]  Most e-cigarettes thus contained relatively little nicotine compared to combustible cigarettes, which limited their popularity.  JLI changed that.  It deliberately created a potent, highly addictive e-cigarette – one that delivered more nicotine to users than competitors' products, but looked nothing like combustible cigarettes.

38.     To do so, JLI turned to various entities associated with Altria Group, Inc. ("Altria"), which have been manufacturing and selling combustible cigarettes for more than a century.  In time, Altria would act as JLI's ally, with ample resources to further expand the market of nicotine addicted e-cigarette users and to keep litigation and regulation at bay.

---

[10] Robert Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-Nicotine Product Market*, 28 Tobacco Control 623 (2019).

39.     Cigarette companies have long known that profit and growth requires a pipeline of replacement customers. Altria, after decades of tobacco litigation and regulation, had little ability to recruit new smokers in the ways that had driven its subsidiary's Phillip Morris's success through most of the 20th century. In 2017, Altria's combustible cigarette products were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.

40.     Additionally, in late 2017, Altria and other major cigarette companies finally complied with the consent decree from tobacco litigation in the 1990s that required corrective advertising statements highlighting the addictiveness and health impacts of smoking cigarettes. Those advertising statements correctly presented the dangers of smoking to potential customers, which limited Altria's ability to attract new smokers.

41.     Even before partnering with JLI, Altria had already attempted to break into the e-cigarette market with the aim of finding new customers and jump-starting revenue. In 2014, it launched the MarkTen e-cigarette nationwide, outspending its market competitors with an aggressive marketing campaign. That effort, however, was ultimately unsuccessful, and the MarkTen never grew into a widely profitable e-cigarette.

42.     With smoking on the decline, litigation and regulatory controls threatening Altria's ability to attract new smokers, and Altria's failure to develop its own profitable e-cigarette, Altria's best bet for maintaining a large U.S. market was to partner with JLI. Doing so would allow Altria to increase the number of users hooked on JUUL products, while slowing or defeating any regulatory opposition.

12

43.     To that end, on December 2018, Altria made a $12.8 billion equity investment in JLI – the largest equity investment in United States history.  This arrangement was profitable for both companies.  JLI employees received $2 billion in bonuses; Altria received millions of loyal teen customers, and the senior management and board members received untold sums of money and saw the value of their shares in JLI skyrocket, allowing them to cash out via a special dividend and bonus as well as through stock sales that were not available to other JLI minority shareholders.  In deciding to make a huge investment in JLI, Altria took into account that the e-cigarette industry would see significant year-over-year growth in the near term, and stated that "JLI continues to be a growth driver for the e-vapor category."[11]

44.     JLI implemented its goal of growing a new market in the image of the combustible cigarette market through a multipronged strategy to: (a) create a highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market; (b) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit; (c) actively attract young users through targeted marketing; and (d) target vulnerable populations like Native Americans whom, as recently noted by the House Subcommittee investigating the vaping epidemic, were used as "guinea pigs" for the testing and introduction of their products and marketing methods.[12]  As detailed more fully throughout this Petition, each of the Defendants played a critical role – at times overlapping and varying over time – in each of the strategies.

---

[11] Letter from Howard A. Willard III, former CEO of Altria, to Senators Richard J. Durbin et al. (Oct. 14, 2019), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/Altria-Response-to-October-1-2019-Senate-Letter.pdf (last visited Aug. 28, 2020).

[12] Subcomm. on Econ. & Consumer Pol'y Mem. at 8.

45.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product.

46.     Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes.  Nicotine's addictive properties are similar to those of heroin and cocaine.

47.     Nicotine fosters addiction through the brain's "reward" pathway.  Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation.

48.     Children are particularly vulnerable to nicotine addiction, as Defendants knew well.  Per the United States Surgeon General, "Tobacco use is a pediatric epidemic."[13] Nine out of ten smokers begin by age eighteen.  80% of users who began as teens will smoke into adulthood.[14]

49.     In 2014, the U.S. Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease); lung diseases, including chronic obstructive pulmonary disease and lung cancer; cancer almost anywhere else in the body; and birth defects.

---

[13] U.S. Dep't of Health & Hum. Servs., *Preventing Tobacco Use Among Youth and Adults: A Report of the Surgeon General* 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html (last visited Aug. 28, 2020).
[14] *Id.*

14

50.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (*i.e.*, a well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before.  JLI marketed that highly addictive device as healthy, safe, cool, and available in kid-friendly flavors.

51.     In doing so, JLI followed the cigarette industry's playbook.   JLI executives eventually admitted that, when creating JLI, they carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement (hereinafter the "Master Settlement Agreement") between the Attorneys General of forty-six States, five U.S. territories, the District of Columbia, and the four largest cigarette manufacturers in the United States.  They were blunt about how useful those documents had been for JLI:  "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries.  And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[15]

52.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest – without the nausea, cough, or other adverse side effects that many new smokers experienced.  In the 1970s, R.J. Reynolds ("RJR") scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid.  The result was a neutralized compound referred to as nicotine salt.  In a 1973 RJR memorandum titled "Cigarette

---

[15] Gabriel Montoya, *Pax Labs: Origins with JAMES MONSEES*, Soc. Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-MONSEES/ (last visited Aug. 28, 2020).

concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJR chemist, Thomas Perfetti, synthesized thirty different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[16] Perfetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette that used nicotine salts. As described herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting nonsmokers, including youth.

53.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device, (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus ("USB") charger. The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring, and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL

---

[16] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf (last visited Aug. 28, 2020).

pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol, along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[17]



54.

55.     A picture of JLI's technology is shown above in paragraph 54.

56.     JLI sells the JUUL pods in packs of two or four pods, and until recently, in a variety of enticing kid-friendly flavors.  Many of the flavors have no combustible cigarette analog, including mango, cool cucumber, fruit medley, cool mint, and crème brûlée.

---

[17] *E-cigarettes and vapor products*, King Cnty. Health Dep't, https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx (last visited Aug. 28, 2020).



57.

58.     A picture of some JUUL pods in different flavors is shown above in

paragraph 57.

59.     JLI attempted to distinguish JUUL products from the death and disease

associated with cigarettes by deliberately providing a false assurance of safety.  For example, on

May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website.  The

document stated that "[JUUL]'s simple and convenient system incorporates temperature

regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the

combustion and the harm associated with it."[18]

60.     JLI even took that message to ninth graders:  In 2018, a representative

from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was

much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer

---

[18] Letter from Ctr. for Tobacco Prods., U.S. Food & Drug. Admin., to Kevin Burns, CEO, JUUL Labs, Inc. (Sept. 9, 2019),   https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019 (last visited Aug. 28, 2020).

alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon."[19]

61.     But JLI's mission was not to improve public health or reduce addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[20]   Rather, JLI sought to introduce a new generation of consumers to nicotine.

62.     JLI achieved that vision.   Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before.   Since JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States.   Its revenues grew by 700% in 2017 alone.   By 2019, JLI owned three-quarters of the e-cigarette market.[21]

63.     JLI sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and would be the most profitable for the Defendants.

64.     JLI knew it had to target its product to those under 25 to secure that sort of market share and long-term loyalty from consumers.   The Institute of Medicine of the National

---

[19] *Id.*

[20] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html (last visited Aug. 28, 2020).

[21] *Durbin & Senators To JUUL: You Are More Interested In Profits Than Public Health*, Senator Dick Durbin (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health (last visited Aug. 28, 2020).

Academies, for instance, concluded that "if someone is not a regular tobacco user by 25 years of age, it is highly unlikely they will become one."[22]

65.     When JLI first widely introduced its product in 2015, approximately 16% of American high school students and 5.3% of middle school students had reported that they had used an e-cigarette in the past thirty days.[23]  By 2019, those rates jumped to 27.5% and 10.5%, respectively.[24]

66.     JLI's product was largely responsible for this teen vaping epidemic.[25]  In 2019, 59.1% of high school students and 54.1% of middle school students reported that JLI was their usual brand of e-cigarette.  The next highest response was "No usual brand."  None of JLI's competitors achieved more than a single-digit response rate.[26]  The FDA Commissioner also pointed to JLI as a significant cause of the rise in teen vaping, stating that "[t]he dramatic spike of youth vaping – [ ]was driven in part at the very least if not largely by Juul. . . .  I hope they recognize the problem that's been created has been created largely by their product."[27]

67.     JLI was aware from the historical cigarette-industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity.  One memo from a Lorillard Tobacco Company marketing manager to

---

[22] *See* Inst. of Med. of the Nat'l Acads., *Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products* 3 (2015), https://www.ncbi.nlm.nih.gov/books/NBK310412/ (last visited Aug. 28, 2020).

[23] *See* Tushar Singh et al., *Tobacco Use Among Middle and High School Students – United States, 2011-2015*, 65 Morbidity & Mortality Weekly Rep. 361 (2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm6514a1.htm (last visited Aug. 28, 2020).

[24] Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095, 2098 (2019).

[25] Terms such as "vaping" and "e-cigarette use" are used interchangeably throughout the industry, among regulators, health officials, and consumers.  These terms also vary according to time periods dating back to 2006.  The Cherokee Nation uses them interchangeably throughout this Petition to refer to the use of devices that deliver nicotine by "vaporizing," *i.e.*, aerosolizing a liquid that includes chemicals and flavorings to create an aerosol that is inhaled by the user.

[26] Cullen et al., *supra* note 24, at 2099.

[27] Julia Belluz, *Scott Gottlieb's last word as FDA chief: Juul drove a youth addiction crisis*, Vox (Apr. 5, 2019 7:10 AM), https://www.vox.com/science-and-health/2019/4/5/18287073/vaping-juul-fda-scott-gottlieb (last visited Aug. 28, 2020).

the company's president put it succinctly: "The base of our business is the high school student."[28]  It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers.  Claude Teague of RJR titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market."[29]  In it he frankly observed: "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market.  In my opinion this will require new brands tailored to the youth market."[78]  Dr. Teague also noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," *i.e.*, not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6."[30]

68.     The JUUL products did exactly that.  They delivered a high concentration of nicotine without the burning "throat hit" that often comes from smoking combustible cigarettes.

69.     A study by Anna K. Duell, et al., (the "Duell Study") examined 4% benzoate solutions – the basis for JUUL's subsequent commercial formulations – and explained why JUUL products deliver such little "throat hit."  The Duell Study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brûlée" was 0.07.[31]  Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine.  For comparison, "Zen" brand e-liquid

---

[28] Letter from T. L. Achey to Curtis Judge (August 1978), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=kqng0121 (last visited Aug. 28, 2020).

[29] Claude Teague, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market* (1973),  https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=lhvl0146 (last visited Aug. 28, 2020).

[30] *Id.*

[31] U.S. Patent No. 9,215,895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Rsch. in Toxicology 431, 432 (Fig. 3) (2018) [hereinafter "Duell Study"].

contains 17 mg/ml of nicotine – less than one-third of the total nicotine content of JUUL's flavors – but has a free-base fraction of 0.84,[32] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[33]

70.     Dramatically reducing the "throat hit" is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers – especially children and young adults. The cigarette industry has long recognized this. A published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[34] The Duell Study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[35]

71.     JLI also distinguishes itself, and established the patentability of its e-liquids, by its products' superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[36] that drives addiction and abuse.[37] Because "nicotine yield is

---

[32] Duell Study, Abstract.

[33] *Id.* at 431-34.

[34] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. Times (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html (last visited Aug. 28, 2020).

[35] Duell Study at 433 (citing J.G. Willett et al., *Recognition, use and perceptions of JUUL among youth and young adults*, 28 Tobacco Control 115 (2018)).

[36] Letter from Frank J. Golby to R. A. Blevins, Jr., Director, Marketing Planning (Dec. 4, 1973), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mzfx0091 (last visited Aug. 28, 2020).

[37] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." U.S. Dep't of Health & Hum. Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* 181

22

strongly correlated with tobacco consumption," a JUUL pod with more nicotine will strongly correlate with higher rates of consumption of JUUL pods, generating more revenue for JLI.

72.     In yet another study, the "Reilly Study" tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff.  By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[38]  Correcting to account for the different puff sizes between these two studies, that study suggests that, at 75 mL/puff, a Marlboro would deliver about 114-145 μg/puff.  In other words, the Reilly Study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

73.     As a fact sheet published by the European Commission notes:  "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a combustible cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[39]  With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the nicotine dose of a combustible cigarette.

74.     JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic.  Chenyue Xing, a JLI engineer, stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul – unlike a cigarette – never burns out," so the device gives no signal to the user to stop.  According

---

(2010),   https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf   (last visited Aug. 28, 2020).

[38] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/ (last visited Aug. 28, 2020).  Here, "μg" is an abbreviation for a microgram, or one millionth of a gram.

[39] *E-Cigarettes*, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited Aug. 28, 2020) (citing Konstaninos E. Farsalinos et al., *Evaluation of Electronic Cigarette Use (Vaping) Topography and Estimation of Liquid Consumption: Implications for Research Protocol Standards Definition and for Public Health Authorities' Regulation*, 10 Int'l J. Ent'l Rsch. & Pub. Health 2500 (2013)).

to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."[40] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly."[41]   JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold.  For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[42]  But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[43]

75.    Just a few years previously, in 2009, the FDA banned cigarettes containing any artificial or natural flavoring (other than tobacco or menthol), announcing that "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[44]

76.    By the time JLI finally ceased selling (some of) its flavored pods – again, in response to growing pressure in the face of the teen vaping epidemic – millions of underage consumers had been exposed to its product.

77.    JLI's physical product was also designed to appeal to youth.  It is small enough to be concealed in a fist, a backpack, or a small pocket, without the visible lump easily recognized as pack of traditional cigarettes.

---

[40] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/ (last visited Aug. 28, 2020).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youths*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html (last visited Aug. 28, 2020).

78.     JLI's e-cigarette also has features with no apparent purpose other than targeting youth-oriented tech and gaming culture.  For example, the device's battery indicator light flashes in "party mode" when the user shakes the device.  The feature does not impact the device's functionality, but it has resulted in free viral advertising in the form of numerous Internet posts and tutorials written or recorded by teenagers explaining how to activate "party mode."  One YouTube video of a 17-year-old student explaining how to "keep your juul in party mode" received over 850,000 views before it was taken down.

79.     Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth.  One JLI co-founder drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics.  This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device.  This wasn't smoking or vaping, this was Juuling."[45]  The evocation of technology makes JUUL products familiar and desirable to the younger tech-savvy generation, particularly teenagers.

## IV.   JLI ATTEMPTS TO DECEIVE THE PUBLIC INTO THINKING ITS PRODUCTS WERE FUN AND SAFE ALTERNATIVES TO CIGARETTES THAT WOULD ALSO HELP SMOKERS QUIT

80.     In response to intense negative media attention and tremendous pressure from investigators due to JLI's widespread use among underage consumers, JLI in mid-2018 redefined its mission and marketing from a youth-oriented campaign to one more closely resembling smoking cessation.

81.     JLI updated its website to depict middle-aged adults in non-glamorous settings, and suggested that JLI exists solely for the benefit of adult smokers looking for an alternative to traditional tobacco products.

---

[45] Vox, *How JUUL Made Nicotine Go Viral*, YouTube (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok (last visited Aug. 28, 2020).

82.     In fact, JLI's product is unsuitable as a smoking cessation device. Researchers have found that millions of current e-cigarette users – especially young adults – had *never* smoked before they began vaping.[46]   And evidence shows that underage consumers and young adults who start vaping are more likely to begin using combustible cigarettes than those who do not.

83.     JLI has and continues to represent that its products are not intended for new or inexperienced smokers.  JLI's website proclaims that its products were "designed with adult smokers in mind."   But as discussed in this Petition, JLI was specifically developed, designed, and marketed to attract young and inexperienced smokers.

84.     In addition, the instructions that JLI includes with its devices are geared to new or inexperienced smokers.  The instructions encourage users, at the start, to "take small puffs" and "get a feel" for the vapor, "then ease into inhaling."  The instructions continue: "If it feels too harsh, try inhaling less and puffing more gently."   Moreover, JLI's instructions encouraged these new smokers to keep trying until they acclimated to the addictive device: "Don't give up, you'll find your perfect puff."

85.     JLI marketed and continues to market its pods as "5% strength."  "5% strength" refers to the pods' nicotine content, but until JLI became subject to FDA labeling regulations in 2018, it did not state that its product contained nicotine.  JLI hoped that consumers would intuitively associate "5" as an average strength.

86.     But the "5% strength" labeling is misleading.  The 5% refers to the amount of nicotine by weight (milligrams of nicotine per milligram of e-liquid).  The industry

---

[46] Michael Joseph Blaha, *Will Vaping Lead Teens to Smoking Cigarettes?*, Johns Hopkins Medicine https://www.hopkinsmedicine.org/health/wellness-and-prevention/does-vaping-lead-to-smoking (last visited Aug. 28, 2020).

26

standard among e-cigarette companies, however, is to advertise nicotine concentration by volume (milligrams of nicotine per milliliter of e-liquid). A weight specification is not meaningful without specifying the density of the e-liquid, which JLI does not advertise.

87. In fact, JLI's pods contain 59 milligrams of nicotine per milliliter in each 0.7-milliliter pod, amounting to a 5.9% per volume concentration. Some studies have shown that JLI's pods have higher concentrations of nicotine than the advertised 5%, even when measured by weight.

88. When JLI was first introduced, the typical e-cigarette contained e-liquids at 1-2% nicotine strength by volume. For perspective, 3% strength has been described as intended for the two-pack-a-day smoker,[47] and the European Union banned any e-cigarette product containing more than 20 milligrams of nicotine per milliliter of e-liquid.

89. JLI's rivals were spurred into increasing the amount of nicotine in their own products, resulting in "a nicotine arms race."[48]

90. JLI also advertises that a pod is equivalent to a pack of cigarettes because both a pod and a pack of cigarettes can be exhausted in roughly 200 "puffs."

91. As with the pod "strength" labeling, the advertisement that a pod is equivalent to a pack of cigarettes is misleading. Although the amount of nicotine ingestion can vary depending on the type of cigarette and user's inhalation, JLI pods contain substantially more nicotine than any typical pack of cigarettes. For example, an average smoker ingests anywhere from less than 1 milligram to approximately 2 milligrams of nicotine content per

---

[47] *5 Questions: Robert Jackler says Juul spurs 'nicotine arms race'*, Stanford Med. Sch. (Feb. 6, 2019), https://med.stanford.edu/news/all-news/2019/02/5-questions-robert-jackler-says-juul-spurs-nicotine-arms-race.html (last visited Aug. 28, 2020).
[48] *Id.*

cigarette, or roughly 20 milligrams to 40 milligrams per pack of cigarettes. A single JLI pod includes approximately 50 milligrams of nicotine.

92.    In addition, JLI's own patent indicates that its nicotine salt solution causes blood nicotine levels to be higher than a traditional cigarette.[49] Moreover, users of combustible cigarettes cannot continuously smoke an entire pack of cigarettes. By necessity, some of the tobacco burns without any consumption of smoke by the user, and some gets discarded with the filter. In contrast, a JUUL pod can be continuously puffed and the entirety of the nicotine can be absorbed by the user.

93.    One study demonstrated that the pulmonary absorption of nicotine in e-cigarette products may be *four times* that of a combustible cigarette.[50] Further, unlike cigarette smoke, where only a portion of the nicotine adheres to the lungs for absorption, aerosolized nicotine can bind to particles that can be deposited directly into the lungs, where it can be rapidly absorbed into the pulmonary veins and, eventually, into the brain.[51]

## V.    JUUL ACTIVELY ATTRACTS YOUNG USERS THROUGH TARGETED MARKETING

94.    With a highly addictive substance in a small, stylish device, all that JLI needed was a base of consumers who would consistently buy JUUL products. It soon learned what tobacco companies had known for years: The most reliable way to create a market for tobacco products is to ensure that children, teens, and young adults become addicted.

95.    To that end, JLI replicated several highly successful strategies for targeting children and young users that Big Tobacco had perpetrated years earlier. It

---

[49] U.S. Patent No. 9,215,895, cols. 7-8.

[50] Nat'l Acads. of Scis., Eng'l, Med. et al., *Public Health Consequences of E-Cigarettes* (2018), https://www.nap.edu/catalog/24952/public-health-consequences-of-e-cigarettes (last visited Aug. 28, 2020).

[51] *Id.* at 97.

supplemented these strategies with the personalized marketing capabilities of the Internet and social media, allowing JLI to bypass the limitations of traditional advertising methods.

96.    JUUL created the perfect storm – a highly addictive drug, sweet to the taste, gentle on the throat, fun to smoke, cool, easy to obtain, and easy to hide. JLI aggressively marketed that product to youth, most of whom had never smoked cigarettes and otherwise would never have become addicted to nicotine.

97.    One of JLI's first marketing campaigns, called "Vaporized," launched in June 2015. This multimillion-dollar campaign was directed specifically at a youthful audience both in substance and delivery.

98.    JLI hired two creative agencies to work on Vaporized. The first, Cult Collective, promised to provide companies with a competitive edge by "focusing on proven platforms that . . . forge fanatical loyalty."[52] The second, Grit, touts itself as an "authority on Millennial culture."[53]

99.    On information and belief, internal JLI e-mails and e-mail exchanges between JLI and its marketing firms in 2015 demonstrate that it was JLI's intent to target young audiences. These exchanges also show that JLI failed to implement any standards to ensure that its products would not reach underage consumers.

100.    The Vaporized campaign flooded social media with posts that used models who appeared to be in their twenties or younger to depict a fun, trendy lifestyle, with hip trendsetters typically "dressed for a night out," in midriff-exposing crop tops, ripped jeans, and jean jackets. Richard Mumby, JLI's first Chief Marketing Officer, noted that rather than being

---

[52] *About Us*, Cult, https://cultideas.com/about (last visited Aug. 28, 2020).
[53] *About*, Grit, http://www.gritcreativegroup.com/#/about (last visited Aug. 28, 2020).

"overtly reliant on just the product," Vaporized would use the young models to portray a "dynamic energy."[54]

101.    JLI knowingly used images of models that "registered as" or appeared to be inappropriately young.

102.    Around the same time, JLI hosted "launch parties" in glamorous locations, where it handed out free samples and encouraged guests – some of whom were underage – to try its product.

103.    JLI knew, or should have known, that the images from the Vaporized campaign and its launch parties would appeal to underage consumers and would induce them to buy and use JLI's products.

104.    In addition to using traditional advertising like print magazines and newspapers, JLI pushed out the Vaporized campaign across millions of websites and mobile applications.

105.    JLI partnered with online advertising exchanges that allowed it to specify which websites and mobile applications would carry its ads.  Among others, JLI chose websites designed for young children, such as those belonging to Nickelodeon and Cartoon Network – two television channels aimed at children and adolescents.

106.    JLI also purchased advertisements on other websites featuring games designed for young children.  JLI also purchased advertisements on websites designed to help middle-and high-school-aged students develop math and social studies skills, as well as for high

---

[54] Declan Harty, *Juul Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign*, AdAge (June 23, 2015), https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142 (last visited Aug. 28, 2020).

school students hoping to attend college.  JLI also purchased banner advertisements on websites designed for teenagers, such as teen.com, seventeen.com, and hireteen.com.

107.    JLI's ads linked to JLI's website.  JLI tracked consumers who visited its website but did not complete a purchase.  JLI then purchased advertising space on other websites that those consumers subsequently visited.  Many of JLI's website visitors who did not complete a purchase were underage and had failed (or did not complete) JLI's age-verification process.

108.    On information and belief, citizens of the Cherokee Nation – including Cherokee Nation youth – were exposed to JLI's online advertising.

109.    In addition to websites and mobile applications, JLI promoted its product on social media, also employing a youth-oriented strategy.

110.    JLI paid online publishers to promote advertising on its social media accounts on Instagram, Facebook, and YouTube.  JLI did this to circumvent policies by two of the largest social media platforms, Facebook, and Instagram, that specifically prohibited paid advertisements for tobacco products.

111.    On information and belief, JLI also maintained its own social media accounts and employed no age-verification process to ensure that its posts would be targeted at adults.

112.    JLI also partnered with social media "influencers," whom it paid to promote its products.  JLI specifically valued influencers because they appealed to the youth demographic.  Social media influencers and other promoters that JLI approached or recruited include the pop star Miley Cyrus; Luka Sabbat, described in one profile as "the Internet's

Coolest Teenager";[55] and Claudia Oshry, a popular social media presence with a youthful following. When JLI first began its advertising efforts in the summer of 2015, Cyrus, Sabbat, and Oshry were all between 18 and 22 years old.

113.    Social media platforms allow users to follow "hashtags." JLI's primary hashtag, #juul, had over a quarter of a million followers by 2018. Many of the hundreds of thousands of posts associated with that hashtag were created by underage consumers and featured underage consumers using JLI's products.[56]

114.    JLI monitored the use of its hashtags and the associated social media posts.

115.    JLI knew, or should have known, that underage consumers were following its social media accounts, advertising posts, and sponsored hashtags.

116.    Based on the photographs, comments, and other content posted to social media platforms featuring underage consumers, JLI knew, or should have known, that its product was used by and extremely popular with underage consumers.

117.    By the time JLI finally disabled its social media accounts after growing pressure, millions of underage consumers had been exposed to its advertising. JLI's gesture was too little, too late.

118.    On information and belief, citizens of the Cherokee Nation – including underage consumers who were Cherokee Nation citizens – were exposed to JLI's social media advertising.

---

[55] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion (last visited Aug. 28, 2020).

[56] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market* 1, 19 (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (last visited Aug. 28, 2020) [hereinafter "Jackler Study"].

119.   Dr. Robert K. Jackler, a professor at Stanford University School of Medicine, founded the Stanford Research into the Impact of Tobacco Advertising ("SRITA") in 2007.  SRITA's purpose is to study the promotional practices of the tobacco industry, publish research on those practices, and maintain a web repository of tobacco advertising.  Dr. Jackler, along with several colleagues, performed a rigorous analysis of JLI's advertising entitled, "JUUL Advertising Over its First Three Years on the Market" ("Jackler Study").[57]

120.   The Jackler Study reviewed all of JLI's advertising and social media posts, as well as news media reports.  SRITA created a collection of over 1,500 JUUL advertisements, 30 JUUL promotion videos, and 82 comparisons between JUUL advertising and traditional tobacco advertising.  Dr. Jackler and his team conducted a content analysis of the JUUL marketing to evaluate for possible youth orientation.[58]

121.   After extensive and rigorous review of JUUL marketing, the Jackler Study came to the following conclusions.[59]  It concluded that, "JUUL's advertising imagery in its first 6 months on the market was patently youth oriented.  For the next 2½ years it was more muted, but the company's advertising was widely distributed on social media channels frequented by youth, was amplified by hashtag extensions, and catalyzed by compensated influencers and affiliates."

122.   The Jackler Study analyzed 25 JUUL sampling events taking place in 2015 and concluded: "These were youth-oriented entertainment events, usually either music or cinema themed, whose primary purpose was to distribute free samples of JUUL devices and their

---

[57] *See supra* note 56.
[58] *Id.* at 3.
[59] *Id.*

33

flavor pods to a youthful audience in order to help establish JUUL in the vapor marketplace."[60]

The Jackler Study further noted: "Images from the events show a youthful audience appearing to be in their 20s. Some attendees were photographed in poses reminiscent of teen behavior, such as wearing a hat on backwards, while holding a skateboard, or a girl with purple hair holding a JUUL."[61]

123.   The Jackler Study concluded that: "The principal focus of these activities was to get a group of youthful influencers to accept gifts of JUUL products, to try out their various flavors, and then to popularize their products among their peers."[62]

124.   The Jackler Study also analyzed the "Vaporized" campaign described above and concluded that "[t]he net effect of the initial campaign was to establish a notably youth-oriented brand for JUUL."[63]

125.   The Jackler Study also made conclusions about the style/identity of the JUUL products promoted by its marketing: "In its early advertising, JUUL depicted stylish and attractive models of a type youthful consumers would like to emulate. Attractive girls in pants torn at the knee dressed in crop tops with their navel showing. Men wearing jeans or khaki pants. Many smiling broadly and in whimsical poses, always with a JUUL in hand."[64]

126.   The Jackler Study concluded that "[f]ew products have disrupted a market as quickly and thoroughly as JUUL has to e-cigarettes. Aside from becoming its dominant player, JUUL's rise also expanded the size of the overall e-cigarette market. Over its first few

---

[60] *Id.* at 5.
[61] *Id.*
[62] *Id.* at 6.
[63] *Id.* at 7.
[64] *Id.* at 14.

years, the Vaporized campaigns and its successors fulfilled the aspirations of its creative agency (Cult Collective) to give the brand 'a cult-like following.' "[65]

127.   From the outset of the Vaporized campaign, JLI collected the e-mail addresses of visitors to its website for its e-mail marketing list.  JLI regularly sent e-mails to its marketing list that promoted JUUL products and offered special deals, "starter kits," and discounts.  JLI indiscriminately sent these marketing e-mails to e-mail addresses it had collected, including e-mail addresses associated with consumers who had failed JLI's age-verification process or did not complete JLI's age-verification process after attempting to make a purchase of JLI's e-cigarettes.

128.   In the summer of 2017, JLI engaged a contractor to determine the ages of the persons associated with e-mail addresses on its e-mail marketing list.  According to this analysis, 83% of the approximately 420,000 e-mail addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.  Tens of thousands were associated with individuals whom JLI's age-verification system marked as underage.

129.   JLI nevertheless continued to send marketing e-mails to this list despite knowing that a substantial majority of those on the list had not passed its own age-verification process or had affirmatively failed it.

130.   On July 30, 2018, the Washington Post published an article describing JLI's practice of sending marketing e-mails to people who had not passed or had failed its age-

---

[65] *Id.* at 27.

verification process.[66] Only after that article was published, in August 2018, did JLI require consumers to pass its age-verification process to continue to receive JLI's marketing e-mails.

131.   On information and belief, JLI knowingly sent marketing e-mails to citizens of the Cherokee Nation that did not pass or had failed its age-verification process.

132.   JLI sells its products on its website.   JLI purports to employ an age-verification system to prevent minors from purchasing its products through its website.   From at least 2015 to 2018, however, JLI's online age-verification system was ineffective at stopping minors from buying JLI's products.

133.   During an initial period following JLI's debut, online customers on paxvapor.com were not age-verified at all during purchases.   When the company instituted an age-verification process in 2016, it resulted in a 26% decrease in customers.

134.   That decrease occurred even though, for at least the first year, the age-verification process did not work for consumers living in many locations.   In one instance, JLI's online checkout page did not block a purchase request associated with a May 11, 2015 date of birth – *i.e.*, that of a baby.   One JLI employee warned the company during this time that at least one customer had "orders ship out in the past" but was "NEVER age verified."

135.   During this time, the age-verification process also failed to require a 100% match between the information a customer entered into the system and public records.   As a result, many sales were completed even though the information in the public records did not match the information submitted by a customer.   For example, at times, JLI did not require the

---

[66] *See* Deanna Paul, *E-cigarette maker Juul targeted teens with false claims of safety, lawsuit says*, Wash. Post (July 30, 2018, 6:29 PM), https://www.washingtonpost.com/news/to-your-health/wp/2018/07/30/e-cigarette-maker-juul-targeted-teens-with-false-claims-of-safety-lawsuit-claims/ (last visited Aug. 28, 2020).

year of birth submitted to match the year of birth available through public records. JLI eventually corrected this flaw, causing the age-verification "pass rate" to fall by 5-7%.

136.   In addition to these flaws, there were a variety of ways for underage consumers to circumvent JLI's age-verification process. For example, if, while placing an online order, a customer input a date of birth that reflected that they were underage, JLI still permitted the sale, so long as any person above the minimum age was registered with the same public records information. This allowed customers who share the same name with an adult in the same household – for example, with a parent – to circumvent the age-verification process. Veratad, JLI's third-party contractor that operated the age-verification system, informed JLI about this possible "father/son scenario."

137.   JLI also provided customers who failed the age-verification process multiple opportunities for a "do over." Consumers were first given an opportunity to provide a different mailing address than that which they initially submitted. If they continued to fail age verification, they could try repeatedly, so long as they kept creating new JLI accounts. For example, in 2017, one JLI employee said that "[w]e still don't really have clarity on when it is/is not appropriate to give the [customer] another chance." Another JLI employee responded: "So long as the customer creates a new account with his correct information . . . , he should be fine." The first employee replied: "Ok cool. This will be the [customer's] fourth time trying, haha."

138.   Veratad notified JLI in 2018 that the number of minors attempting to purchase JUUL products through its website was higher than other online access points in the industry.

139.   JLI was aware of the deficiencies in its age-verification process, but it prioritized reducing "friction" in the online purchasing process over instituting effective age

controls. Internal communications demonstrate that JLI was more concerned with eliminating false positives (*i.e.*, legal purchasers failing verifications), which would suppress sales, than with eliminating false negatives (*i.e.*, underage purchasers passing verification). At one point, JLI's head of customer service instructed staff to "avoid . . . digging around looking" for evidence of underage purchases.

140.    Parents also frequently complained that JLI's age-verification process was insufficient. For example, one "parent of a teenager now addicted to e-cigarettes and an active user of Juuls" e-mailed the company in July 2018: "I am writing to let you know that you are not doing a good job of preventing young people from purchasing Juuls online. My son is going through them quickly and is able to purchase them easily. I believe that the only way you will be able to prevent young people from purchasing Juuls, especially online, is to do an ID check, using a government issued ID or driver's [license] to check – believing them online about their age is totally ineffective. They may have a waiting period when you check, but it's worth preventing entire generations from becoming addicted."

141.    Internal JLI communications from the summer of 2017 show that JLI knew its age controls continued to be defective. For example, a JLI employee observed that the current wording of JLI's age-verification webpage "just encourages users to lie." He also noted that he "entered a fake 1996 bday" and still "passed" age verification. Another employee commented that there were "40 people in checkout right now" to which another responded, "40 teenagers trying to buy 200 juuls." Still another employee stated that he "put incorrect info for my user and my Age was verified." And another employee stated he "created a new account, ordered with bad info, and was" age-verified, clarifying that "I was verified but the address I entered (and phone number) [were] similar to my current address but not real."

142.   In August 2018, in the context of replicating the age-verification process in the United Kingdom, a JLI director expressed reservations about whether JLI's age-verification "criteria [are] strict enough yet," reminding other upper-level managers about an experiment he had just conducted that allowed him to circumvent JLI's age-verification process using an incorrect address and postcode. He reported that the information he submitted on JLI's website was incorrect, but that JLI's website treated him as age-verified anyway. He suggested as a next step that the "Address Match . . . needs to require a higher level of data match," "otherwise we open ourselves up to massive scrutiny from a Daily Mail journalist who comes and passes our [age verification] by using random credentials."

143.   On information and belief, numerous underage consumers who are citizens of the Cherokee Nation have purchased tobacco products from JLI's website.

144.   On information and belief, JLI also conducted "secret shopper" inspections of authorized retailers across the country. JLI determined that underage consumers were able to purchase JUUL e-cigarettes at retailers in Oklahoma, but it nevertheless continued to authorize those retailers to sell its products.

## VI.   THE DEFENDANTS USED TOXIC FLAVORINGS WITHOUT WARNINGS AND WITHOUT ENSURING THEY WERE SAFE FOR USE

145.   The flavoring additives and raw ingredients used in JUUL e-liquids are known causes of lung injuries when inhaled in a workplace setting.[67]

146.   Several studies have examined the effects of exposure to inhaled flavoring additives in e-liquids and determined that inhalation of flavoring additives in e-cigarette aerosol carry a significant risk of toxicity and other injuries.[68]

---

[67] *Flavorings-Related Lung Disease, Exposure To Flavoring Chemicals: What Are Flavorings?*, Nat'l Inst. for Occupational Safety & Health (October 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/exposure.html (last visited Aug. 28, 2020).

147.   Despite the body of evidence demonstrating a significant risk associated with the flavoring additives used in JUUL e-liquids, Defendants failed to warn consumers or the public, including the Cherokee Nation of this risk thereby recklessly disregarding the safety of the thousands of JUUL users throughout the Cherokee Nation, including many teenagers and young adults who were nonsmokers.

148.   Upon information and belief, Defendant JLI entered into an agreement in California with Defendant Mother Murphy's and Defendant Alternative in or around 2014 wherein, in conjunction with JLI, Mother Murphy's and Alternative designed, manufactured and supplied flavoring additives and the flavored e-liquids pursuant to JLI directives and specifications derived from JLI's patents for use in its JUUL pods. Upon information and belief, Mother Murphy's and Alternative continue to design, manufacture, and supply flavoring additives and flavored e-liquids to JLI for use in its JUUL pods to this day.

149.   Mother Murphy's and Alternative use their own chemical additives and flavorings to formulate the e-liquids. However, "the overall manufacturing processes are unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JLI's responses to Congress.[69]

150.   Despite the knowledge of the inhalation risks, Mother Murphy's and Alternative manufactured e-liquids and placed the products into the stream of commerce for millions of people, including members of the Cherokee Nation, to inhale without warning of any risks caused by inhalation of the ingredients contained therein.

---

[68] Jessica L. Fetterman et al., *Flavorings in Tobacco Products Induce Endothelial Cell Dysfunction*, 38 Arteriosclerosis, Thrombosis, & Vascular Biology 1607 (2018); Isaac Sundar et al., *E-cigarettes and Flavorings Induce Inflammatory and Pro-senescence Responses in Oral Epithelial Cells and Periodontal Fibroblasts*, 7 Oncotarget 77196 (2016); Hae-Ryung Park et al., *Transcriptomic Response of Primary Human Airway Epithelial Cells to Flavoring Chemicals in Electronic Cigarettes*, 2019 Scientific Reports 1400 (2019).

[69] Subcomm. on Econ. & Consumer Pol'y Mem. at 6.

151.   Due to the continued blockbuster success and increased demand for JUUL products, as well as anticipated global expansion, JLI entered into an agreement with the Maryland-based corporations Defendant TTI and Defendant Eliquitech in or around 2017 wherein TTI and Eliquitech also manufactured and supplied flavoring additives and blended the flavored e-liquids in JUUL pods.   Upon information and belief, TTI and Eliquitech continue to design, manufacture, and supply flavoring additives and flavored e-liquids in conjunction with JLI for use in its JUUL pods to this day.

152.   On information and belief, neither TTI nor Eliquitech had ever tested the products for safety risks associated with utilizing the material in e-liquids.   In fact, TTI and Eliquitech were fully aware that the safety data sheets prepared for each flavoring additive specifically stated that the ingredient carried inhalation health risks.   Despite the knowledge of the inhalation risks, TTI and Eliquitech manufactured e-liquids utilizing these ingredients and placed the product into the stream of commerce for millions of people, including members of the Cherokee Nation, to inhale without warning of any risks caused by inhaling of the ingredients contained therein.

153.   The flavoring additives and raw ingredients manufactured and supplied by the E-liquid Manufacturers and used in the JUUL e-liquid formulations as designed in conjunction with JLI are associated with severe and significant risks of acute and chronic lung injuries, cardiovascular injuries, and seizures.   The E-liquid Manufacturers knew, or should have known, of the risks and failed to warn the Cherokee Nation and its members who used JUUL products, and failed to ensure that JLI, their contractual partner and customer, warned its consumers of the risks, in reckless disregard for human safety.

41

154.   The E-liquid Manufacturers were all manufacturers and suppliers of flavoring ingredients for JUUL e-liquids utilizing flavoring additives.   The E-liquid Manufacturers were negligent in failing to warn the Cherokee Nation and its members who used JUUL products, and failing to ensure that JLI, their contractual partner and customer, warned its consumers of the risks associated with inhaling its products, in reckless disregard for human safety.

## VII.   JLI TARGETED YOUTH RETAIL LOCATIONS WITH THE ASSISTANCE OF THE DISTRIBUTOR DEFENDANTS AND THE RETAIL DEFENDANTS

155.   For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales.   JLI marketed its products extensively in convenience stores, employing brightly colored video and product displays that showed the JUUL device in the hands of youthful-looking users.   The retail marketing scheme worked, and by late-2017, JUUL became the most popular e-cigarette sold in convenience stores, according to Nielsen data.[70]

156.   Like all in-store cigarette advertising, JLI's point-of-sale materials played a major role in driving youth addiction.   JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the "JUUL store locator" and offering discounts.   And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

---

[70] Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Kan. Dep't of Health & Env't (July 6, 2018), https://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf (last visited Aug. 28, 2020).

157.    After achieving early success, JLI knew that to take its profits to the next level and dramatically expand the market for JUUL products, it needed to access a broader distribution channel – namely, marketing and selling its products in the thousands of chain convenience stores throughout the United States.  Indeed, a single contract to market and sell through a convenience store chain could result in JUUL being sold in thousands of stores to millions of customers.

158.    JLI not only had emulated the cigarette industry in its marketing, but it also sought to recreate the cigarette industry's distribution machine to push that marketing to a far wider swath of consumers.  That distribution machine included the major retail convenience stores ("Chain Convenience Stores").  It also included the cigarette industry distributors that had been the powerful middlemen between the cigarette industry and the Chain Convenience Stores in the cigarette market for decades.

159.    The distributors are giants in the cigarette industry that have played a significant role in the decades of massive cigarette sales in America.  For example, the cigarette industry Distributors Defendant McLane is a wholly-owned subsidiary of Berkshire Hathaway with annual revenue of approximately $50 billion.  McLane provides wholesale distribution services in all fifty states to customers that include convenience stores, discount retailers, wholesale clubs, drug stores, military bases, quick-service restaurants, and casual dining restaurants.  McLane maintains a dominant market share within the convenience-store industry and serves most of the national convenience-store chains, providing products to approximately 50,000 retail locations nationwide.  McLane has served as one of the largest tobacco distributors in the United States for the cigarette industry giants such as Altria and RJR.

160.   Similarly, Core-Mark is one of the largest wholesale distributors to the convenience-retail industry in North America, providing sales, marketing, distribution, and logistics services to approximately 43,000 customer locations across the United States and Canada.  Core-Mark posted annual revenue of over $16 billion in 2018.

161.   Eby-Brown is the largest privately-owned distributor of tobacco and candy to convenience stores in the United States.  The company services over 14,500 convenience stores throughout the country, including the convenience-store chain Speedway.

162.   The Distributor Defendants were integral partners to elevate the JUUL market and ensure that JLI's false and deceptive marketing campaign had a wide reach.  Indeed, from years of partnering with the cigarette industry and their existing relationships with the Chain Convenience Stores, the cigarette-industry distributors already had the existing infrastructure to widely push JUUL products to a massive audience already serviced by their existing customers.  Just as the Distributor Defendants were enormously valuable to JLI, JLI was valuable to the Distributor Defendants and the Retail Defendants because, like the cigarette manufacturers, they were losing profits over the decline in cigarette sales following the efforts to combat the cigarette industry's prior illegal marketing campaigns.

163.   Capitalizing on the void left by the slowdown in cigarette sales, JLI approached the cigarette-industry distributors, including McLane, Core-Mark, and Eby-Brown, and convinced them that one of the ways to plug their financial hole was to join JLI in growing the JUUL market.  Collaboration with JLI was lucrative because margins for JUUL products exceeded cigarette profit margins.  This was true not only for retailers but also for the cigarette-industry distributors.

164.   Reaping the profits from JUUL products, however, was achievable by the Distributor Defendants only if they could convince their Chain Convenience Store trade partners to widely market and sell JUUL products.   The entire supply chain had to commit to the deceptive and dangerous marketing and sales campaign that JLI had started.

165.   Starting in 2016, each of the cigarette-industry distributors, including the Distributor Defendants, committed to elevate the JUUL market by pushing JLI's dangerous products which were designed for and aimed at youth to its Chain Convenience Store partners, and through them to the ultimate customers.   This coordinated scheme was accomplished by ensuring that JLI's deceptive and dangerous marketing campaign was pushed to the Chain Convenience Stores and from there to a wide swath of convenience stores, including those frequented by members of the Cherokee Nation.

166.   The Distributor Defendants became an essential link in the supply chain to push products to millions of customers around the United States, including to members of the Cherokee Nation.   Through their efforts, JUUL products were distributed to young adults, and (illegally) to minors.   The Distributor Defendants never disclosed the nicotine content of JUUL products, nor any of their risks.

167.   The other critical participants in the push to elevate JUUL products included the Retailer Defendants.

168.   Circle K has thousands of stores located throughout the United States. Circle K was designated as a key convenience store.   On information and belief, Circle K was one of the earliest retailers of JUUL products.

169.   JLI also collaborated with retailers such as Walmart and Walgreens.   Both retailers were willing partners in the campaign to target youth and, on information and belief,

45

had no meaningful process for preventing sales to minors throughout their joint marketing campaigns with JLI.

170.   Along with the other Defendants, the Retailer Defendants jointly issued print and digital advertising containing the false marketing messages aimed at youth and downplaying the risks of JUUL products. Often, the advertising contained both the JUUL logo and the logos of participating retail chain convenience stores. JLI and the Retailer Defendants also ran joint promotions designed to drive sales and grow the market for JUUL products.

171.   JLI and the Retailer Defendants conducted joint marketing campaigns that included product placement, distributing product materials in stores, and conducting in-store events to promote JUUL products, all of which distributed the false and misleading messages that had built JLI's early success.

172.   The Jackler Study found that "vaporized imagery" predominated in JUUL point of sale promotions and one campaign appeared in over 20,000 retailers.[71] "In product displays JUUL kits and pods are often elegantly arranged in clear plastic "jewel cases."[72] The SRITA website has collected 49 store window posters and displays.

---

[71] Jackler Study at 19.

[72] *Id.*



173.

174.    A picture of a representative in-store JUUL display is shown above in paragraph 173.

175.    The Retailer Defendants knew or should have known that the JUUL products were hazardous.  It had been known for over a decade that e-cigarettes are hazardous to health.[73]

176.    Even though the Distributor Defendants and Retailer Defendants knew that the JUUL vaping products contained nicotine, from at least 2016 to 2018, the Distributor Defendants and the Retailer Defendants disclosed neither the products' nicotine content, nor any of their risks.

---

[73] *Summary of Results: Laboratory Analysis of Electronic Cigarettes Conducted By FDA*, U.S. Food & Drug Admin. (July 22, 2014), https://www.fda.gov/NewsEvents/PublicHealthFocus/ucm173146.htm [https://web.archive.org/web/20170629073144/https://www.fda.gov/NewsEvents/PublicHealthFocus/ucm173146.htm]; *see also* V. Varlet et al. *Toxicity of Refill Liquids for Electronic Cigarettes*, 12 Int'l J. for Env't Rsch. & Pub. Health 4796 (2015).

177.    The Truth Initiative (the largest nonprofit organization committed to eradicating tobacco use that was created by the Master Settlement Agreement in the Big Tobacco cases) has concluded that "[a]s much as 98.7% of flavored e-cigarette products sold in convenience, dollar, drug and grocery stores contain nicotine."[74]

178.    The Distributor Defendants and the Retailer Defendants achieved results that JLI could not accomplish on its own and by 2016, JLI's false and deceptive marketing campaign was reaching customers in thousands of Chain Convenience Stores around the country.

179.    Some retailers have recently stopped selling e-cigarettes including JUUL Products.  For example, Walmart announced on September 20, 2019, that it would stop selling e-cigarettes "after it winds down its current inventory of e-cigarettes" including JUUL products.[75] Walgreens announced on October 7, 2019 that it also would stop selling e-cigarettes including JUUL products.[76]

## VIII.  USING JUUL PRODUCTS CAN LEAD TO ILLNESS, DISEASE, AND OTHER ADVERSE HEALTH CONSEQUENCES

180.    The negative impact on health from the use of e-cigarettes is pervasive and well-documented.

181.    The use of e-cigarettes, including JUUL, cause significant lung toxicity[77] and have been implicated in multiple severe pathological lung injuries.  Recent studies have

---

[74] Truth Initiative, *Action Needed: E-Cigarettes* 13 (2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/e-cigarettes-facts-stats-and-regulations (last visited Aug. 28, 2020).

[75] Sarah Nassauer, *Walmart to Stop Selling All e-Cigarettes*, Wall St. J. (Sept. 20, 2019), https://www.wsj.com/articles/walmart-to-stop-selling-all-e-cigarettes-11569003925 (last visited Aug. 28, 2020).

[76] Lauren Hirsch & Angelica LaVito, *Kroger, Walgreens to stop selling e-cigarettes, amid backlash and regulatory uncertainty*, CNBC (Oct. 7, 2019 5:57 PM), https://www.cnbc.com/2019/10/07/kroger-latest-retailer-to-stop-selling-e-cigarettes-amid-backlash.html (last visited Aug. 28, 2020).

[77] Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. of Physiology–Lung Cellular & Molecular Physiology L193 (2017).

48

demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[78]

182.    Lung epithelial cells are the first line of defense and provide barrier protection from toxic inhalants.  Epithelial barrier dysfunction can allow toxic inhalants access to systemic circulation by which they can interact with other tissues to generate fibrosis.  In addition, the impaired barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically.  This can lead to acute and chronic lung injury as well as exposure and increased susceptibility to respiratory infections in users of e-cigarettes, including JUUL.[79]

183.    Research has also demonstrated that ultrafine metal particles from heating devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[80]  In addition, exposure to JUUL aerosol has shown to significantly impair endothelial function comparable to the impairment of endothelial function caused by use of combustible cigarettes.[81]

184.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke cause lung injuries such as chronic obstructive pulmonary disease, emphysema, asthma, and chronic bronchitis.[82]

---

[78] Thivanka Muthumalage et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019).

[79] Laura E. Crotty Alexander et al. *Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. of Physiology–Regul., Integrative & Compar. Physiology R834 (2018).

[80] Alessandra Caporale et al., *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019).

[81] Poonam Rao et al., *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tobacco Regul. Sci. 30 (2020).

[82] Francesca Polverino et al. *COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?*, 8 Pulmonary Circulation (Feb. 22, 2018).

185.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[83]

186.    A study published in December 2019, found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with a 75% increased chance of developing chronic bronchitis, emphysema, and chronic obstructive pulmonary disease compared to those who never used e-cigarettes.[84]

187.    Moreover, the flavoring compounds used in e-cigarettes such as JUUL include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and benzaldehyde. These chemicals are linked to serious lung disease.[85] Further details as to the chemical alphabet soup comprising the JUUL liquid are set forth throughout this Petition. A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis, and collapsed lungs, among others.

188.    Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes.

---

[83] Phillip W. Clapp & Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential Link to Asthma*, 79 Current Allergy & Asthma Reps. 17 (2017).

[84] Albert D. Osei et al., *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Preventative Med. 949 (2019).

[85] Ctrs. for Disease Control & Prevention, *Flavorings-Related Lung Disease* (2017), https://www.cdc.gov/niosh/topics/flavorings/default.html (last visited Aug. 28, 2020); Won Hee Lee et al., *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.*, 73 J. Am. College of Cardiology 2722 (2019); Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic'*, N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettessickness (last visited Aug. 28, 2020).

This prompted an investigation by the Centers for Disease Control ("CDC") of an outbreak of vaping-associated lung injuries. The reported injuries mirrored the injuries that had been reported in the medical literature since 2012.

189. In October 2019, the CDC, recognizing the seriousness of the vaping epidemic, issued treatment guidelines to assist doctors in clinical practice including a protocol for inquiring about vaping or e-cigarette history of use. The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses ("EVALI").

190. Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome, diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Researches noted that, though the precise manifestations of the respiratory injury may be diverse, there were clues to the precipitants that warrant attention. About 80% of the persons who vaped and became ill reported having used both nicotine products and tetrahydrocannabinol ("THC") or cannabidiol ("CBD") products. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit. Research suggested that mixing multiple ingredients with primary compounds and potential contaminants may result in *in vitro* (or even *in vivo*) production of new agents that may be toxic.[86]

---

[86] David C. Christiani, *Vaping-Induced Acute Lung Injury*, New England J. Med (Mar. 5, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe1912032 (last visited Aug. 28, 2020).

191.    Furthermore, a recent publication in 2020 noted that there were almost 2,000 cases of EVALI at the time it was written.   The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak, but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[87]

192.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[88] Diffuse alveolar hemorrhage ("DAH") is a life-threatening disorder that refers to bleeding that originates in the pulmonary microvasculature.  It often results in acute respiratory failure.[89]

193.    Hypersensitivity pneumonitis is a disease of the lungs in which the lungs become inflamed because of an allergic reaction to inhaled dust, fungus, molds, or chemicals. Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.[90]

194.    Recent studies have also found links between youth vaping and e-cigarette use and COVID-19.   One such study concluded that, compared to baseline demographic expectations, "COVID-19 diagnosis was five times more likely among" youth who used e-cigarette products.[91]

---

[87] Sascha Ellington et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use- Associated Lung Injury – United States, August 2019-January 2020*, 69 Morbidity & Mortality Weekly Rep. 44 (2020).

[88] Michael Agustin et al., *Diffuse Alveolar Hemorrhage Induced by Vaping*, 2018 Case Reps. in Pulmonology  (June 7, 2018); Peter J. Edmonds et al., *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reps. (Jan. 7, 2020).

[89] Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 S. Med. J. 269 (2011).

[90] Casey G. Sommerfield et al., *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome from E-Cigarette Use*, 141 Pediatrics (June 2018).

[91] Shivani Mathur Gaiha et al., *Association Between Youth Smoking, Electronic Cigarette Use, and Coronavirus Disease 2019*, J. of Adolescent Health (Aug. 11, 2020), https://www.jahonline.org/article/S1054-139X(20)30399-2/fulltext (last visited Aug. 28, 2020).

195.    In sum, it has been well established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome, asthma, emphysema, and chronic obstructive pulmonary disease.

196.    Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL. In fact, JLI downplayed any risk associated with the inhalation of JUUL aerosol and continued to overtly promote JUUL as safe.

197.    Despite JLI downplaying the health risks of using JUUL products in its advertisements, JLI CEO Kevin Burns admitted in August 2019 that the long-term health effects of JUUL are unknown.[92] The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety and warrants an award of punitive damages.

198.    In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks.[93]

---

[92] *Juul CEO to non-smokers: "Don't use Juul.,"* CBS (Aug. 29, 2019), https://www.cbs.com/shows/cbs_this_morning/video/m8cKi_cgxQj8RoGhMbQzQco3rBNSEx9O/juul-ceo-to-non-smokers-don-t-vape-don-t-use-juul-/ (last visited Aug. 28, 2020).

[93] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* American Stroke Ass'n (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries (last visited Aug. 28, 2020); Mohindar R. Vindhyal et al., *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Supplement 2

199.   Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of stroke and heart attack.[94] Furthermore, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries.[95]

200.   On April 3, 2019, the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[96]

## IX.   THE DEVASTATING IMPACT OF DEFENDANTS' ACTIONS ON THE CHEROKEE NATION

201.   The Defendants' wrongful conduct constitutes and poses a significant ongoing threat to the health, welfare, political integrity, and economic security of the Cherokee Nation and its members.

202.   Defendants' conduct has caused and is continuing to cause a health crisis in the Cherokee Nation.  Skyrocketing rates of tobacco use, including by underage consumers, threaten the health, welfare, economic security, and political integrity of the Cherokee Nation and all its citizens.  As a result of the Defendants' actions, the citizens of the Cherokee Nation – including its children – have become addicted to nicotine, resulting in serious injury or death, as

---

(2019); Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke*, 50 Stroke A9 (2019).

[94] Charalambos Vlachopoulos et al., *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers*, 67 J. Am. College of Cardiology 2802 (2016).

[95] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019),   www.webmd.com/mental-health/addiction/news/20190528/vapingmay-hurt-the-lining-of-your-blood-vessels#1 (last visited Aug. 28, 2020).  JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users.  The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals.  *What are JUULpods? Discover Our Pods' Ingredients And Flavors*, JLI, www.juul.com/learn/pods (last visited Aug. 28, 2020).

[96] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Admin. (April 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults (last visited Aug. 28, 2020).

well as short-term and long-term emotional and physical damage that require treatment and long-term care. The financial impact on the Cherokee Nation has been enormous.

203. Defendants' conduct has adversely affected the next generation of Cherokee Nation citizens and threatens the continuation of Cherokee Nation culture, identity, and effective self-government. Those effects are so severe, cumulatively, that Defendants' conduct threatens to cause devastating injuries to the Cherokee Nation.

204. The CDC has found that the ethnic group defined as "American Indians/Alaska Natives" have the highest prevalence of cigarette smoking compared to all other racial/ethnic groups in the United States.[97] American Indians/Alaska Natives have a higher risk of experiencing smoking-related disease and death due to high prevalence of cigarette smoking and other commercial nicotine use.[98] Lung cancer is the leading cause of cancer death among this group and diabetes is the fourth leading cause of death.[99] The risk of developing diabetes is 30-40% higher for smokers than nonsmokers.[100] More American Indian/Alaska Native women smoke during their last three months of pregnancy than any other ethnic group – 26%.[101]

205. Quitting rates are relatively low among American Indians/Alaska Natives compared to other racial/ethnic groups.[102]

---

[97] *American Indians/Alaska Natives and Tobacco Use*, CDC (Nov. 25, 2019), https://www.cdc.gov/tobacco/disparities/american-indians/index.htm (last visited Aug. 28, 2020).

[98] *Id.*

[99] *Id.*

[100] *Id.* (citing U.S. Dep't of Health & Hum. Servs., *The Health Consequences of Smoking – 50 Years of Progress: A Report of the Surgeon General* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm (last visited Aug. 28, 2020)).

[101] *Id.* (citing V. Tong et al., *Trends in Smoking Before, During, and After Pregnancy – Pregnancy Risk Assessment Monitoring System, United States, 40 Sites, 2000-2010*, 62 Morbidity & Mortality Weekly Rep. 1 (Nov. 8, 2013)).

[102] *Id.* (citing US. Dep't of Health & Hum. Servs., *Tobacco Use Among U.S. Racial/Ethnic Minority Groups: A Report of the Surgeon General* (1998), https://www.cdc.gov/tobacco/data_statistics/sgr/1998/index.htm (last visited Aug. 28, 2020)).

206.    E-cigarette use is a growing problem for American Indian youth. According to the National Youth Tobacco Survey data, 16.1% of American Indian/Alaska Native middle-school students and 40.4% of American Indian/Alaska Native high-school students were current users of e-cigarette products.[103]

207.    A Congressional inquiry of the youth vaping epidemic has uncovered new facts about JLI, including JLI's admission that its targeting of Native Americans was more pervasive than initially known.[104]   The Subcommittee memorandum stated that one of its key accomplishments was obtaining testimony that JUUL was "targeting Native Americans as guinea pigs for its product."[105]

208.    Congressional testimony revealed that "JUUL tried to sell its product through tribal health agencies' smoking cessation programs, despite not having FDA approval to do so.  JUUL also made unfounded claims that its product was healthy."[106]

209.    Further testimony stated that "JUUL proposed to sell starter kits valued at $50 to the tribe for $5 apiece.  The tribe would then turn around and provide free JUUL starter kits to patients who enroll in the switching program.  Throughout JLI's presentation, it made multiple claims that JUUL products are effective for smoking cessation and less harmful than tobacco products."[107]

---

[103] *Tobacco Use in the American Indian/Alaska Native Communities*, Truth Initiative (May 28, 2020), https://truthinitiative.org/research-resources/targeted-communities/tobacco-use-american-indianalaska-native-community (last visited Aug. 28, 2020).

[104] Subcomm. on Econ. & Consumer Pol'y Mem. at 8.

[105] *Id.*

[106] *Id.* (citing *Examining JUUL's Role in the Youth Nicotine Epidemic: Hearing Before the Subcomm. On Econmic and Consumer Policy of the H. Comm. On Oversight and Reform*, 116th Cong. (June 24, 2019) (statement of Rae O'Leary, Public Health Analyst, Missouri Breaks Industry Research), https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-i (last visited Aug. 28, 2020)).

[107] *Id.*

210.    In response to inquiries from the House Subcommittee, JLI admitted that it made similar pitches to at least eight Native American tribes.[108]    JLI also admitted that it contacted an undisclosed additional number of tribes with similar pitches but refused to identify those additional tribes or to state how many it contacted.

211.    The House Subcommittee found that representatives of JLI appeared at tribal council meetings of various tribes offering free JUUL vaping devices.[109]    JLI representatives told tribal members that they would be better off without cigarettes and could replace them with JUUL electronic vaping devices and cartridges as part of a "switching program."

212.    The Cherokee Nation runs its own healthcare system, referred to as Cherokee Nation Health Services.  It is the largest tribally operated health system in the country with more than 1.3 million patient visits a year.  It offers a variety of services to Cherokee Nation citizens.  Through the health system, the Cherokee Nation operates eight health centers and one hospital within the tribe's fourteen-county jurisdiction.  The health service also offers smoking cessation programs.

213.    In its fiscal year 2019, the Cherokee Nation spent $339.1 million on its health services.[110]

214.    Defendants' wrongful and unlawful actions have caused tens of millions of dollars in excess healthcare costs that the Cherokee Nation must bear as well as significant excess costs in the future.

---

[108] Subcomm. on Econ. & Consumer Pol'y Mem. at 8; *see also* Jamie Ducharme, *'It's Insidious': How Juul Pitched E-Cigarettes to Native American Tribes*, Time (Feb. 6, 2020 11:38 AM), https://time.com/5778534/juul-native-american-tribes/ (last visited Aug. 28, 2020).

[109] *Id.*

[110] Cherokee Nation, Popular Annual Financial Report for Fiscal Year Ended September 30, 2019 5 (2020), https://www.cherokee.org/media/gaahnswb/pafr-fy19-final-v-2.pdf (last visited Aug. 28, 2020).

## COUNT ONE – NUISANCE

215.   The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-214.

216.   Defendants had a duty to provide accurate information about the dangers of using their products, including the risk that users would become addicted to nicotine. Defendants also had a duty to market and sell their products only to adults, and not to market or sell those products to minors.

217.   Defendants failed to perform those duties.  They improperly held their products out as healthy, safe alternatives to smoking.  They also marketed and knowingly sold their products to minors.

218.   Defendants unreasonably and significantly interfered with the Cherokee Nation's public health, safety, peace, and public comfort through their role in deceptively and improperly marketing their products to children and other underage consumers, thus igniting a vaping epidemic that has ravaged the Cherokee Nation.

219.   In failing to perform their duties, Defendants injured and endangered the Cherokee Nation's public health, safety, peace, and public comfort.  Specifically, they induced countless Cherokee Nation citizens – including children and adolescents – to begin using nicotine products.  Many of those citizens became addicted.

220.   Defendants also injured and endangered the Cherokee Nation's public health, safety, peace, and public comfort through their role in deceptively and improperly marketing their products as smoking cessation devices, thus exacerbating nicotine dependencies, and creating new ones.

221.   Defendants knew or should have known that their marketing of products was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance.

222.   Defendants knew that their products are tobacco products and contain nicotine, that nicotine is highly addictive, and that it is illegal to sell or furnish tobacco products to underage individuals.  Even so, Defendants knowingly and actively marketed their products to youth.  Defendants knew that underage individuals in the Cherokee Nation were using their products, yet Defendants did not take appropriate corrective or ameliorative actions.  Defendants handed out JUUL products to individuals at sampling events without providing any nicotine warning.

223.   Defendants engaged in a calculated marketing campaign designed to promote their addictive products as a safe alternative to cigarettes and as an effective way to quit smoking when they were neither safe nor effective as smoking cessation devices.  In doing so, Defendants minimized, obscured, and misrepresented the true nicotine content and addictive qualities of its products.

224.   Defendants also specifically targeted children and young adults by designing their products' shape and function, flavors, and chemical compositions to appeal to these age groups, with full knowledge that they would have such appeal; engaged in marketing strategies that were intended to entice children; failed to use adequate age-verification processes for online sales; obscured the true nicotine potency of their e-cigarette products; and understated the strength of the nicotine in their products.

225.   That conduct was unlawful.  Oklahoma law prohibits selling or providing e-cigarettes to any person under the age of 21.  Okla. Stat. Ann. §§ 1-229.12, 1-229.13.

226.   Defendants' unlawful conduct also offended decency.  Defendants sought to profit by peddling dangerous substances to children and young adults, endangering the lives and health of many of the most vulnerable members of the Cherokee Nation.

227.   Defendants' unlawful conduct has affected the entire Cherokee Nation as a community.  Indeed, it has threatened the very fabric of Cherokee Nation society.  The Cherokee Nation has been forced to devote more of its resources to treating health problems associated with nicotine exposure, to addiction-related programs, and to education measures encouraging its citizens not to begin using e-cigarettes.  The Cherokee Nation has also had to divert educational resources to educating its children about the dangers of vaping.  As a result, the Cherokee Nation has a diminished pool of available resources to other societal concerns, such as education, job creation, and cultural preservation.

228.   Defendants' conduct was a substantial factor in the youth vaping epidemic.  Defendants' conduct was also a substantial factor in deceiving youth into believing their products were appropriate to their age range.  Without Defendants' conduct, vaping would not be so widespread in the Cherokee Nation.

229.   The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

230.   Defendants' conduct is widespread and persistent, and it has created, is creating, and will likely continue to create substantial ongoing harm to the Cherokee Nation.  The Cherokee Nation has incurred and will continue to incur substantial costs from investigating, treating, policing, educating, and remediating the vaping epidemic.

231.   Defendants' conduct created an ongoing, man-made crisis that could not have been foreseen by the Cherokee Nation.

232.   The public nuisance, and resulting public health epidemic, caused by Defendants' conduct, is a direct and proximate cause of the injuries and harms sustained by the Cherokee Nation and its citizens including, but not limited to: increased healthcare costs; increased youth nicotine addiction rates; retrospective and prospective costs associated with reducing and preventing youth addiction; and diversion of resources designated for other purposes to combat the influx of vaping in classrooms, schools, and homes.

233.   The public nuisance caused by Defendants' actions is substantial and unreasonable.

234.   Defendants' conduct interferes with the Cherokee Nation's right to be free from unwarranted injuries, addictions, diseases, and sicknesses causing ongoing hurt, inconvenience, and other adverse consequences to its citizens.

235.   Defendants' conduct has affected and continues to affect a considerable number of young people and others in the Cherokee Nation.  Many in the Cherokee Nation continue to become addicted to nicotine due to Defendants' products.  That addiction has caused, is causing, and will continue to cause physical – sometimes fatal – harm, as well as mental harm to those who have become addicted.  And addicted individuals will require a significant amount of medical and preventative care in the future.

236.   Defendants' actions have caused unique injuries to the culture and social fabric of the Cherokee Nation as well as to the ability of the Cherokee Nation to protect its citizens.

237.   Defendants must abate the public nuisance caused by their conduct in marketing, furnishing, and selling their products to underage persons and other persons in the Cherokee Nation.

61

## COUNT TWO – NEGLIGENCE

238. The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-214.

239. At all relevant times, Defendants owed the Cherokee Nation and its members a duty to exercise reasonable care in designing, marketing, advertising, distributing, and selling their products. Defendants also owed a duty to effectively communicate all dangers of their products, the exact content and nicotine values of their products, the addictiveness and harm of their products, and the true usefulness and safety of their products as cigarette alternatives.

240. Defendants owed a duty of reasonable care to ensure that their products were not attractive to youth.

241. Defendants breached those duties. Their breaches include, but are not limited to, the following acts described below.

242. Defendants failed to perform adequate testing of JUUL products prior to marketing to ensure safety, including long-term testing for potential injury to the brain and cardiovascular, respiratory, pulmonary and immune systems; other related medical conditions; as well as effects on mental health.

243. Defendants failed to warn consumers that JUUL products had not been adequately tested or researched prior to marketing to ensure safety.

244. Defendants failed to take reasonable care in the design of JUUL products.

245. Defendants failed to use reasonable care in the production of JUUL products.

246.    Defendants failed to use reasonable care in the manufacture of JUUL products.

247.    Defendants failed to use reasonable care in the assembly of JUUL products.

248.    The Distributor Defendants failed to use reasonable care in supplying and distributing JUUL products.

249.    Defendants failed to use reasonable care in advertising, promoting, and marketing JUUL products.

250.    Defendants failed to use reasonable care in the sale of JUUL products without adequate warnings.

251.    Defendants used flavors and product design that were intended to appeal to minors and young people.

252.    Defendants used a product design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction.

253.    Defendants failed to utilize proper materials, ingredients, additives, and components in the design of JUUL products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals.

254.    Defendants failed to ensure that JUUL products operated properly and did not deliver unsafe levels of nicotine that could lead to injuries and health consequences described herein.

255.    Defendants failed to reasonably and properly test JUUL products and analyze the results of those tests.

256.    Defendants failed to warn consumers about the dangers associated with use of JUUL products, failing to warn that it is unsafe; significantly increases blood pressure; causes vascular and pulmonary damage; causes seizures; carries risks of stroke, heart attacks, and pulmonary and cardiovascular events; is powerfully addictive; and can cause permanent brain changes, including mood disorders and impairment of thinking and cognition.

257.    Defendants failed to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained in JUUL products.

258.    Defendants failed to warn consumers of the actual nicotine content in JUUL products.

259.    Defendants deceptively stated that the amount of nicotine in JUUL pods is "approximately equivalent to a pack of cigarettes," when the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes.

260.    Defendants misleadingly advertised an equivalence between JUUL pods and combustible cigarettes, ignoring the different pharmacokinetics of JUUL e-cigarettes as compared to combustible cigarettes.

261.    Defendants failed to provide any instructions regarding a safe amount of JUUL pods to consume in a day.

262.    Defendants failed to take necessary steps to modify JUUL products to avoid delivering high doses of nicotine and repeatedly exposing users to toxic chemicals.

263.    Defendants failed to verify the age of consumers purchasing JUUL products.

264.    Defendants failed to recall JUUL products.

265.   Defendants shipped JUUL products to retail locations with actual or constructive knowledge that retailers were not utilizing age verification procedures and illegally selling to minors.

266.   Defendants failed to communicate the harmfulness and highly addictive quality of their products.

267.   Defendants misrepresented the true nicotine content in their products.

268.   Defendants claimed, without evidence, that their products were safe, less addictive than cigarettes, and effective in helping users quit smoking.

269.   Each and every one of the above acts or omissions, individually or in combination, injured the Cherokee Nation.

270.   Specifically, Defendants' conduct led to rampant nicotine addiction, which has created a public health crisis in the Cherokee Nation. That crisis has strained the Cherokee Nation's public health system and depleted its money and resources. It has also caused widespread damage to the tribe's social and cultural practices. As a result, Defendants' conduct has threatened the continued existence of the Cherokee Nation.

271.   That damage was foreseeable. Defendants knew, or should have known with the exercise of reasonable care, the risks to consumers of using JUUL products, as they are powerfully addictive and dangerous nicotine-delivery devices.

272.   Defendants knew, or should have known with the exercise of reasonable care, that minors and young people would be attracted to these products.

273.   Defendants knew, or should have known with the exercise of reasonable care, that the use of JUUL products was dangerous, harmful, and injurious when used by consumers in a reasonably foreseeable manner, particularly by children and young adults.

65

274.    The Defendants knew, or should have known with the exercise of reasonable care, that ordinary consumers would not have realized the potential risks and dangers of JUUL products. JUUL products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

275.    Defendants knew, or should have known with the exercise of reasonable care, that JUUL products posed risks including the risks of addiction; lung injuries; seizure; strokes; heart attacks; cardiovascular injuries; behavioral, cognitive, and mental health injuries; and other harmful effects, as described herein, that were known or knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL products.

276.    Defendants knew or should have known that JUUL products needed to be researched, designed, manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, and sold properly, without defects and with due care to avoid needlessly causing harm.

277.    Defendants knew or should have known that JUUL products could cause serious risk of harm, particularly to underage consumers and young adults.

278.    Defendants knew or should have known that adults who were encouraged to cease smoking by using JUUL as a cessation device were individuals with greater preexisting cardiovascular and other health risk factors who were at enhanced risk of harm when utilizing JUUL products whose misleading packaging misrepresented the nicotine content and failed to warn of the other chemicals' content and risks.

66

279.   JLI was negligent in affirmatively encouraging new JUUL users through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh," and urging, "[d]on't give up, you'll find your perfect puff."   That message pushed users to keep vaping through physical discomfort or pain.

280.   Defendants were negligent, reckless, and careless, and they failed to take the care and duty owed to the Cherokee Nation, thereby causing the Cherokee Nation to suffer harm.

281.   Defendants' conduct created an ongoing, man-made crisis which could not have been foreseen by the Cherokee Nation.

## PRAYER FOR RELIEF

WHEREFORE, the Cherokee Nation prays that the Court grant the following relief:

(a) injunctive relief;

(b) compensatory damages;

(c) abatement and remediation costs:

(d) restitution and disgorgement;

(e) punitive damages;

(f) attorneys' fees and costs; and

(g) all such other relief this Court deems just and fair.

The Cherokee Nation seeks a trial by jury for all counts so triable.

DATED:   September 3, 2020          Respectfully submitted,


*Sara Hill*
_____
Sara Hill, Oklahoma Bar No. 20072
Attorney General
Chrissi Ross Nimmo, Oklahoma Bar No. 22248
Deputy Attorney General
John Young, Oklahoma Bar No. 31889
Assistant Attorney General
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464
(918) 453-5726
john-young@cherokee.org

Frank Sullivan, III, Oklahoma Bar No. 19582
SULLIVAN & SULLIVAN, PLLC
P.O. Box 768, 105 N. Oak
Sallisaw, OK 74955
(918) 775-9149
fsullivan@franksullivanlaw.com

Steven F. Molo, *pro hac vice* motion forthcoming
Jessica Ortiz, *pro hac vice* motion forthcoming
W. Alex Harris, *pro hac vice* motion forthcoming
Leonid Grinberg, *pro hac vice* motion forthcoming
MOLOLAMKEN LLP
430 Park Avenue
New York, New York 10022
(212) 607-8160
smolo@mololamken.com
jortiz@mololamken.com
wharris@mololamken.com
lgrinberg@mololamken.com

Richard W. Fields, *pro hac vice* motion forthcoming
Martin F. Cunniff, *pro hac vice* motion forthcoming
FIELDS PLLC
1901 L Street, N.W.
Suite 700
Washington, D.C. 20036
(832) 382-9816
fields@fieldslawpllc.com
martincunniff@fieldslawpllc.com

68